**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

CHRISTOPHER SANBORN                          CIVIL ACTION

VERSUS                                       NUMBER: 08-0702

N. BURL CAIN, WARDEN                         SECTION: "I"(5)

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. §636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. §2254(e)(2).  For the following reasons, IT IS HEREBY RECOMMENDED that the instant petition be **DISMISSED WITH PREJUDICE.**

I.   PROCEDURAL HISTORY[1]/

Petitioner, Christopher Sanborn, is a state prisoner who is presently incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On July 26, 2000, Sanborn was found guilty of two counts of armed robbery after trial, by jury, in the Twenty-Ninth Judicial District Court for the Parish of St. Charles, State of Louisiana, for which he was later sentenced to two concurrent jail

---

[1]/ A portion of the procedural history was taken from an earlier Report and Recommendation (rec. doc. 24), issued in response to one of Sanborn's two motions to stay.

terms of seventy-five years without benefit of parole, probation, or suspension of sentence.  Sanborn's conviction and sentences were affirmed on direct appeal.  <u>State v. Sanborn</u>, 831 So.2d 320 (La. App. 5th Cir. 2002), <u>writ</u> <u>denied</u>, 854 So.2d 346 (La. 2003).

After filing his petition here in January of 2008, Sanborn filed a motion to stay, representing that he had a habeas application pending in the state trial court.[2/]  The State opposed the motion to stay, reporting that petitioner had nothing pending in the state courts.[3/]  Petitioner then filed a second motion to stay, this time arguing that he had a writ application pending in the Louisiana Supreme Court in which he was seeking re-review of his post-conviction writ application to the Louisiana Fifth Circuit Court of Appeal which, he alleged, had not been presented to a three-judge panel as required by law.[4/]  The State confirmed that Sanborn did indeed have a writ application pending before the Louisiana Supreme Court.[5/]  The State further advised that it had no objection to a stay of this proceeding until such time as the Louisiana Supreme Court ruled on the writ application pending before it.[6/]  On January 7, 2009, the Court issued a Report and Recommendation recommending that the above-captioned action be

---

[2/] Rec. doc. 16.

[3/] Rec. doc. 18.

[4/] Rec. doc. 21.

[5/] Rec. doc. 23.

[6/] <u>Id</u>.

stayed.[7]   On February 6, 2009, the District Judge adopted the Court's recommendation and ordered that the matter be stayed.[8]

In May, 2009, Sanborn filed a motion to reopen, advising that his writ application was no longer pending before the Louisiana Supreme Court as that tribunal had transferred the matter to the Louisiana Fifth Circuit Court of Appeal.[9]   On June 1, 2009, the District Judge issued an order granting Sanborn's motion to reopen in light of the fact that his writ application was no longer pending before the State's Highest Court, but again staying the matter as his writ application was then pending before the state appellate court.[10]

In May, 2012, Sanborn filed a second motion to reopen, representing that he had, at last, exhausted his state court remedies.[11]   Attached to Sanborn's motion to reopen was a lengthy amended petition.[12]   On May 21, 2012, the District Judge issued an order granting Sanborn's motion to reopen and referring the matter to the undersigned.[13]   On May 23, 2012, the undersigned granted Sanborn leave to file his lengthy amended petition, clarifying that

---

[7]/ Rec. doc. 24.

[8]/ Rec. doc. 25.

[9]/ Rec. doc. 26.

[10]/ Rec. doc. 27.

[11]/ Rec. doc. 30.

[12]/ Rec. doc. 30-1.

[13]/ Rec. doc. 31.

"[t]he petition that will be considered by the Court is that which was attached to petitioner's motion to re-open and which was filed herein as rec. doc. 30-1."[14]

On June 22, 2012, the State filed its response to Sanborn's amended petition.[15]  On July 2, 2012, Sanborn filed a traverse to the State's response.[16]

On September 17, 2012, Sanborn filed a motion to supplement his petition.[17]  On September 21, 2012, the undersigned granted Sanborn's motion but specified that "[n]o further amendments or supplements will be allowed."[18]  On January 11, 2013, the State filed a response to Sanborn's supplemental claim.[19]  On January 18, 2013, Sanborn filed a response to the State's response.[20]

Accordingly, the pleadings presently before the Court are: (1) Sanborn's amended petition (rec. doc. 34); (2) the State's response

---

[14]/ Rec. doc. 33.

[15]/ Rec. doc. 40.

[16]/ Rec. doc. 42.

[17]/ Rec. doc. 43.

[18]/ Rec. doc. 44.

[19]/ Rec. doc. 47.

[20]/ Rec. doc. 48.  On January 28, 2013, Sanborn filed a motion for leave to file another supplemental response.  (Rec. doc. 49).  On January 31, 2012, the Court denied Sanborn's motion pursuant to its earlier order (rec. doc. 44) wherein it specified that no further amendments or supplements would be allowed.  (Rec. doc. 50).

thereto (rec. doc. 40); (3) Sanborn's traverse to the State's response (rec. doc. 42); (4) Sanborn's supplemental claim (rec. doc. 43); (5) the State's response to Sanborn's supplemental claim (rec. doc. 47); and, (6) Sanborn's response to the latter response. (Rec. doc. 48).

II.   <u>FEDERAL HABEAS PETITION</u>

In his amended petition (rec. doc. 34), Sanborn argues that his counsel was ineffective for failing to seek a mistrial when Danielle Kenner testified on cross-examination and on re-direct examination that Sanborn had hit her on several occasions.  Sanborn also complains that a mistrial was warranted when the prosecutor discussed Kenner's testimony in closing arguments.

In his "Motion to Supplement Claim" (rec. doc. 43), Sanborn also argues that counsel was ineffective in failing "to file [a] motion to arrest judgment due to the substantially defective indictment."[21]/  Sanborn complains that the amended indictment was defective because it did not contain all of the elements of the charged offense, thereby failing to inform him of "the crime against which he had to defend."[22]/  The State has acknowledged that

---

[21]/ Rec. doc. 43, p. 7.

[22]/ Rec. doc. 43, p. 11.

Sanborn has exhausted available state court remedies and that the instant action is timely.[23]/

III.   <u>GENERAL STANDARDS OF REVIEW</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, comprehensively revised federal habeas corpus legislation, including 28 U.S.C. §2254.  The AEDPA went into effect on April 24, 1996[24]/ and applies to habeas petitions filed after that date.  <u>Flanagan v. Johnson</u>, 154 F.3d 196, 198 (5th Cir. 1998)(citing <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997)).  The AEDPA therefore applies to Sanborn's action, which was originally filed here in January, 2008.

The threshold questions in habeas review under the amended statute are whether the petition is timely and whether the claims raised by the petitioner were adjudicated on the merits in state court, i.e., the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim. <u>Nobles v. Johnson</u>, 127 F.3d 409, 419-20 (5th Cir. 1997), <u>cert</u>. <u>denied</u>, 523 U.S. 1139 (1998)(citing 28 U.S.C. §2254(b), (c)).  As

---

[23]/ Rec. doc. 40, p. 4.

[24]/ The AEDPA, which was signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law.  <u>United States v. Sherrod</u>, 964 F.2d 1501, 1505 n.11 (5th Cir. 1992), <u>cert</u>. <u>denied</u>, 507 U.S. 975 (1993).

noted above, the State concedes, and the record reflects, that Sanborn has exhausted state court remedies and has timely filed the instant petition.  As such, the Court will proceed to address the merits of Sanborn's claims following a discussion of the applicable facts and standards of review.

IV.   <u>FACTS</u>[25]/

On August 11, 1999, the St. Charles Parish Grand Jury returned a true bill, charging the Defendant in count 1 of attempted second degree murder of John Carroll, in violation of La. R.S. 14:27, 30.1, and in count 2 of conspiracy to commit second degree murder of John Carroll, in violation of La. R.S. 14:26, 30.1. Danielle Kenner (Kenner), Marion Sanborn (Marion), and Ty Collins (Collins) were charged as co-defendants.  The Defendant was arraigned on August 19, 1999 and pled not guilty to both counts.  The Defendant was arraigned a second time on September 16, 1999 and again pled not guilty.

On January 19, 2000, the State amended the bill of indictment to charge, in count 1, armed robbery of John Carroll and in count 2, armed robbery of Mattie Holmes, both in violation of La. R.S. 14:64.  The amendments applied to all of the defendants named in the indictment.  On the same day, the State moved the trial court to sever the cases of Collins and the Defendant for separate trials, which was granted.

On July 25, 2000, the Defendant was arraigned on the amended charges and entered a plea of not guilty.  The Defendant went to trial individually before a jury of twelve persons on July 25 and 26, 2000.

At trial, co-defendant Kenner testified for the State that, on the night of June 10, 1999, she met with the Defendant, Collins, her boyfriend, at the time of the offense, her then boyfriend, and Marion, the Defendant's cousin, at Marion's house in New Orleans. Kenner drove the

---

[25]/ The facts were taken from the Louisiana Fifth Circuit Court of Appeal's opinion on direct appeal, <u>State v. Sanborn</u>, 831 So.2d 320 (La. App. 5th Cir. 2002).

group in her car to a Burger King restaurant on Airline Highway at Ormond Boulevard in Destrehan, Louisiana. Kenner testified that she had been employed there.

The group arrived at the Burger King after it was closed for the night. The only two employees on the premises were Mattie Holmes (Holmes), the night porter, and John Carroll (Carroll), an assistant manager who had just completed his first day on the job. Kenner was familiar with Holmes's nightly work routine and knew when she would be exiting the restaurant to put trash in the dumpster. After waiting for a short time in the car, the Defendant and Collins exited and waited at the dumpster. She further testified that she gave the Defendant a blue bandanna. Kenner and Marion drove off. Kenner testified that she was aware that the Defendant and Collins planned to rob the Burger King and then flee the scene in the manager's car.

Marion testified that she also knew of the plan to rob Burger King. She attempted to talk the men out of it, but when they proceeded with the plan, she went along because she was concerned for her cousin's safety.

Marion went into a Winn-Dixie grocery to buy cigarettes and Kenner used a nearby pay telephone to call Holmes at the Burger King. She testified that her intention was to warn Holmes of the impending robbery, so that she would not be injured. Kenner did not, however, warn Holmes. Instead, she told Holmes that she intended to stop at the restaurant to pick up some pies that were left over after closing. She asked Holmes to meet her outside of the restaurant.

Holmes testified that she was surprised to receive a call from Kenner, but agreed to bring her two pies. She then went back to work. Holmes went out of the back door to put the trash in the dumpster. A man said, "This is a stickup." Assuming this was a prank, she asked, "Who in the hell is playing." The man responded, "You think I'm playing? You come see." Holmes moved into the light to find a man pointing a gun at her. A second man, his face covered with a blue bandanna, stood behind the gunman.

The men ordered Holmes to open the door. She told them that she could not. One of the men grabbed her and pushed her inside the restaurant. The men demanded that Holmes show them to the office and she complied. The man without the mask told her to remove her uniform shirt and she did so.

The men then ordered Holmes to get on the floor in the cooler.

Carroll testified that at midnight he was in his office doing paperwork.  The other restaurant employees, with the exception of Holmes, had departed at around 11:30 p.m. Carroll did not hear anyone enter his office, but saw a silver object, which he later realized was a revolver.  He saw someone wearing a dark blue mask. He only described the man as dark skinned.  He was hit in the head with the gun and sustained a wound that required 18 stitches.

The masked man pushed Carroll to the floor.  The man shoved the gun against Carroll's head and said, "Open the f-ing safe."  A second man entered the room, held a gun to Carroll's head and ordered him to open the safe.  The second man then left the office. Carroll tried the combination, but had trouble opening the safe.  The masked man continued to shove the gun at his head and neck, causing him to miscount. The assailant grew impatient and threatened to kill Carroll if he did not open the safe immediately.  Carroll felt pressure on his left foot and later discovered that the masked man had broken his ankle by stepping on it.  The masked man fired a shot at Carroll, wounding his right thigh.

Despite his injuries, Carroll continued trying to open the safe.  The second man entered the office again and rummaged through Carroll's pockets.  He took Carroll's car keys, office keys and wallet.  He then put his gun to Carroll's head and again demanded that he open the safe. Carroll responded that he was not certain he was using the correct combination and that the combination numbers were written on a piece of paper in his wallet.  The second man threw the wallet to Carroll, who checked the combination and determined that he had been using the correct numbers.  The second man continued to point his gun at various parts of Carroll's body and finally shot Carroll in the hip.

Carroll eventually opened the safe.  The men ordered Carroll to move away from it and Carroll crawled out of the office.  He heard the men rummaging through the safe.  They found a roll of duct tape in Carroll's office and directed Holmes to bind Carroll's legs with it.  Then, they decided against that, and instead had Holmes and Carroll lie on the floor.  They disconnected the office telephone.  Before leaving the building, they ordered Carroll and Holmes to go into the cooler.  Carroll, unable to walk, crawled there.  He

testified that the men took $1,300, but left $3,000 behind on his desk.

Marion testified that she and Kenner were concerned about whether the Defendant and Collins had gotten away from the restaurant safely, so they drove back to investigate.  They saw the Defendant and Collins walking and stopped to pick them up.  The men said that they had shot the manager of the Burger King.  Marion said she did not believe them and they responded that they did not shoot the manager, but were "just playing."  Kenner testified that the Defendant said that he and Collins had each shot the manager once.

The group rode back to New Orleans in Kenner's car. Marion testified that both the Defendant and Collins were carrying guns. They stopped at Collins's house, where the men gave each woman $225.  Kenner testified that they all went to a bar and then to a truck stop casino in the Michoud area of New Orleans.

Meanwhile, at the Burger King, Holmes and Carroll made their way to the nearby Winn-Dixie grocery and had someone there call police.  Detective Sergeant Rodney Madere of the St. Charles Parish Sheriff's Office arrived at the scene, interviewed Holmes, who was outside of the Burger King, then inspected the inside with crime scene technician Michael Jackson.

Detective Madere testified that he saw the manager's car, a white Saturn, outside of the Burger King.  The keys were in the ignition, both front doors were slightly ajar, and the windshield wipers were moving.  There were three rolls of quarters on the seat. Lieutenant Pink Duckworth, a canine officer and his dog discovered a trail of evidence starting near the Burger King and leading in the direction of New Sarpy.  The items found included currency, a pair of gloves, a blue bandanna, and a Burger King uniform shirt.

Detective Madere took Holmes to the Detective Bureau and had her look at "mug shots."  She was able to give a description of the man who was not wearing the mask, but did not find a photograph of him in the book.  Holmes told Detective Madere she had never seen either of the perpetrators prior to that night.  At trial, however, Holmes testified that she had previously seen one of the perpetrators at the Burger King with Kenner.  Carroll did not identify either of the perpetrators.

10

Detective Madere testified that he was called out of town
the day after the robberies and that three other detectives
continued the investigation.  Detective Robert Lynch received
a telephone call from a Burger King employee who said that
Holmes had not told investigators all she knew about the
robbery.  Detective Lynch questioned Holmes, who told him
about the call which she had received from Kenner just before
the robberies.  Detective Lynch interviewed Kenner on June
18, 1999, at which time she implicated the Defendant in the
robberies.  Detective Lynch obtained an arrest warrant for
the Defendant and, with the help of the New Orleans Police
Department, arrested him at his home in New Orleans.

Detective Madere further testified that Kenner went to
Florida following the robberies.  When police investigators
learned of her return, she was questioned again.  On August
9, 1999, she admitted to her own involvement in the
robberies, and named Collins and Marion as participants.
Kenner was placed under arrest along with Collins and Marion.
Marion gave a statement to police on August 13, 1999.

<u>Sanborn</u>, 831 So.2d at
322-25 (footnote omitted).

V.   <u>STANDARDS OF REVIEW</u>

28 U.S.C. §§2254(d)(1) and (2) contain revised standards of
review for questions of fact, questions of law, and mixed questions
of fact and law in federal habeas corpus proceedings.  <u>Carter v.
Johnson</u>, 110 F.3d 1098, 1103 (5th Cir.), <u>vacated</u> <u>on</u> <u>other</u> <u>grounds</u>,
522 U.S. 964 (1997).

Determinations of questions of fact made by a state court are
"presumed to be correct . . . and we will give deference to the
state court's decision unless it 'was based on an unreasonable
determination of the facts in light of the evidence presented in
the State court proceeding.'"  <u>Hill v. Johnson</u>, 210 F.3d 481, 485
(5th Cir. 2000), <u>cert</u>. <u>denied</u>, 532 U.S. 1039 (2001)(quoting 28

U.S.C. §2254(d)(2)).  The amended habeas statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption.  28 U.S.C. §2254(e)(1).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. §2254(d)(1) and receive deference unless the state court's decision "'was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent.]'"  Penry v. Johnson, 215 F.3d 504, 507 (5th Cir. 2000), aff'd in part, rev'd in part on other grounds, 532 U.S. 782 (2001)(quoting Miller v. Johnson, 200 F.3d 274, 280-81 (5th Cir.), cert. denied, 531 U.S. 849 (2000)); Hill, 210 F.3d at 485.  The United States Supreme Court has clarified the Section 2254(d)(1) standard as follows:

> [u]nder the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 412-13 (2000);  Penry, 532 U.S. at 792-93;  Hill, 210 F.3d at 485.  "'A federal habeas court may not issue the writ simply because that court concludes in its

independent judgment that the state court decision applied [a Supreme Court case] incorrectly.'" Price v. Vincent, 538 U.S. 634, 641 (2003)(quoting Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002))(brackets in original); Bell v. Cone, 535 U.S. 685, 699 (2002). Rather, under the "unreasonable application" standard, "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable." Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002), cert. denied sub nom., 537 U.S. 1104 (2003). The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner. Price, 538 U.S. at 641 (quoting Woodford, 537 U.S. at 24-25).

VI.   INEFFECTIVE ASSISTANCE OF COUNSEL

Sanborn claims that his counsel was ineffective because he failed to seek a mistrial in response to Danielle Kenner's testimony and the State's closing argument recapping said testimony. Sanborn also claims that counsel was ineffective in failing "to file [a] motion to arrest judgment" based upon a defective amended indictment.

The issue of ineffective assistance of counsel is a mixed question of law and fact. Woodfox v. Cain, 609 F.3d 774, 789 (5th Cir. 2010); Richards v. Quarterman, 566 F.3d 553, 561 (5th Cir. 2009). Thus, the issue before the Court is whether the state

courts' denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent.

The standard for judging the performance of counsel was set forth by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984), which requires a petitioner to prove both deficient performance and resulting prejudice. Strickland, 466 U.S. at 697.[26] The Supreme Court first held that "the defendant must show that counsel's representation fell below an objective standard of reasonableness." Id. at 687-88. Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694; see also United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999).

In deciding ineffective assistance of counsel claims, a court need not address both prongs of the conjunctive Strickland standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test. Kimler, 167 F.3d at 893. A habeas petitioner "need not show that 'counsel's deficient conduct more likely than not altered the outcome in the case.' But it is not enough, under Strickland, 'that the errors had

---

[26] The Strickland test is applicable for determining the effectiveness of trial counsel as well as appellate counsel. See Busby v. Dretke, 359 F.3d 708, 714 (5th Cir.), cert. denied, 541 U.S. 1087 (2004)(citations omitted)("[t]he familiar Strickland framework applies to a prisoner's claim that his appellate counsel was ineffective for failing to raise a certain issue on appeal.").

some conceivable effect on the outcome of the proceeding.'" <u>Motley</u> <u>v. Collins</u>, 18 F.3d 1223, 1226 (5th Cir.), <u>cert</u>. <u>denied</u>, 513 U.S. 960 (1994)(quoting <u>Strickland</u>, 466 U.S. at 693).  On federal habeas review, scrutiny of counsel's performance "must be highly deferential", and the court will "indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance." <u>Moore v. Johnson</u>, 194 F.3d 586, 591 (5th Cir. 1999)(citing <u>Strickland</u>, 466 U.S. at 689-90).  In assessing counsel's performance, a federal habeas court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time of trial. <u>Strickland</u>, 466 U.S. at 689; <u>Neal v. Puckett</u>, 286 F.3d 230, 236-37 (5th Cir. 2002), <u>cert</u>. <u>denied</u>, 537 U.S. 1104 (2003); <u>Clark</u> <u>v. Johnson</u>, 227 F.3d 273, 282-83 (5th Cir. 2000), <u>cert</u>. <u>denied</u>, 531 U.S. 1167 (2001).

On habeas review, the Supreme Court has recently clarified that, under <u>Strickland</u>, "[t]he question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." <u>Harrington v. Richter</u>, ___ U.S. ___, ___, 131 S.Ct. 770, 788 (2011)(quotation omitted).  The <u>Harrington</u> Court went on to recognize the high level of deference owed to a state

15

court's findings under Strickland in light of the AEDPA, as
follows:

> [t]he standards created by Strickland and §2254(d)
> are both highly deferential, and when the two apply in
> tandem, review is doubly so.  The Strickland standard
> is a general one, so the range of reasonable
> applications is substantial.  Federal habeas courts
> must guard against the danger of equating
> unreasonableness under Strickland with unreasonableness
> under §2254(d).  When §2254(d) applies, the question is
> not whether counsel's actions were reasonable.  The
> question is whether there is any reasonable argument
> that counsel satisfied Strickland's deferential
> standard.

> Id.(quotations and citations omitted).

A court must apply the "strong presumption" that counsel's
strategy and defense tactics fall "within the wide range of
reasonable professional assistance." Strickland, 466 U.S. at 689.
Federal courts have consistently recognized that tactical decisions
when supported by the circumstances are objectively reasonable and
do not amount to unconstitutionally deficient performance. Lamb v.
Johnson, 179 F.3d 352, 358 (5th Cir. 1999), cert. denied, 528 U.S.
1013 (1999)(citing Rector v. Johnson, 120 F.3d 551, 564 (5th Cir.
1997), cert. denied, 522 U.S. 1120 (1998) and Mann v. Scott, 41
F.3d 968, 983-84 (5th Cir. 1994), cert. denied, 514 U.S. 1117
(1995)).  Federal habeas courts presume that trial strategy is
objectively reasonable unless clearly proven otherwise.
Strickland, 466 U.S. at 689; Moore, 194 F.3d at 591.  The burden is
on the petitioner to demonstrate that counsel's strategy was
constitutionally deficient.  Id.

16

A.   <u>DANIELLE KENNER'S TESTIMONY</u>

Sanborn offers several arguments in support of his claim that counsel was ineffective in failing to seek a mistrial based upon Danielle Kenner's testimony.[27]/  Sanborn asserts that the testimony elicited from Kenner was so prejudicial that it rendered his trial fundamentally unfair.

On defense counsel's cross-examination, Danielle Kenner testified in pertinent part, as follows:

Q.  Ms. Kenner, you say you have two kids?
A.  Yes.
Q.  How many kids does Mr. Sanborn have?
A.  One.
Q.  And you say Mr. Sanborn is your ex-boyfriend?
A.  Yes.
Q.  When did he break up with you?
A.  When I came to jail.
Q.  Came to what; I'm sorry?
A.  Jail.
Q.  When was that?
A.  August 9th.
Q.  During the three months that you and my client dated, he cheated on you, didn't he?
A.  Yes.
     **MS. MCELWEE [prosecutor]:**
          That's low; objection....   What is the relevance?
     **MS. WILLIAMS [defense counsel]:**
          It goes to bias, Your Honor, and motive....
     **THE COURT:**
          The objection [is] overruled....
**BY MS. WILLIAMS:**
Q.  And he hurt you terribly, didn't he?
A.  I didn't know until I came to jail.
Q.  You didn't know he had cheated on you until you came to jail?

---

[27]/ Sanborn's arguments are difficult to discern because he randomly switches from one argument to another with no demarcation reflecting that he has changed course.

```
A.  Yes.
Q.  He hurt you terribly, didn't he?
A.  With what?  His fists, yeah.
Q.  When did he hit you?
A.  Oh, many times.  I had marks left.
Q.  Did you ever file a police report?
A.  No.
Q.  So you can't prove that he ever hit you, can you?
A.  No.[28]/
```

On re-direct examination, Kenner gave the following pertinent

testimony:

```
Q.  You said that Chris hit you?
A.  Yes.
Q.  When did Chris hit you?
A.  Many times.
Q.  When?
A.  Like in April.
Q.  April of what year?
A.  '99.
Q.  A couple of months before the robbery?
A.  Yes.
Q.  Where did he hit you?
A.  In the mouth.
Q.  With his fist?
A.  Yes.
Q.  Were you hurt?
A.  Yes.
Q.  What other times did he hit you?
A.  It looked like after that it just was coming
regular.
Q.  And Counsel wants to know why you didn't call the
police.
A.  Because I was scared.[29]/
```

During her closing argument, the prosecutor, in pertinent

part, stated:

> [n]either one of them [Danielle Kenner and Marion
> Sanborn] have ever been in any trouble.  They got mixed

---

[28]/ St. ct. rec., vol. 6 of 7, pp. 70-71.

[29]/ St. ct. rec., vol. 6 of 7, p. 79.

up with the wrong people.  This man beat her up over and over.  She couldn't leave him.  She was afraid of him.  Does that sound familiar?  She was stuck.[30]/

Sanborn, in state post-conviction proceedings, argued that counsel was ineffective for failing to seek a mistrial based upon Kenner's testimony and the prosecutor's closing argument.  The Louisiana Fifth Circuit Court of Appeal addressed[31]/ and rejected Sanborn's argument, stating:

> [I]t appears counsel did not move for a mistrial during the cross-examination of Ms. Kenner for strategic reasons.  In questioning Ms. Kenner about her motives for implicating relator, who was also her boyfriend at the time, counsel asked whether relator had cheated on her.  After Ms. Kenner responded affirmatively, counsel then asked, "He hurt you terribly, didn't he?"  Ms. Kenner then stated, "With what? His fists, yeah."  At this point, counsel did not object, but instead, asked Ms. Kenner further questions about her allegations of physical abuse, which resulted in the witness admitting that she had never filed a police report.  Under these circumstances, counsel arguably opened the door to the testimony about relator's alleged physical attack on Ms. Kenner but then used the testimony to show bias on the part of the witness.  Thus, relator has not "overcome the strong presumption that [counsel's decisions] might be considered strong trial strategy."  Strickland v. Washington, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984) [quotation omitted].  Against this backdrop, relator has not demonstrated that the claimed errors rendered his trial globally

---

[30]/ St. ct. rec., vol. 7 of 7, p. 455.

[31]/ Sanborn suggests that he is entitled to a de novo review of the instant claim because the Louisiana Fifth Circuit failed to address Strickland's prejudice prong.  (Rec. doc. 34, p. 25).  However, as noted supra at p. 14, in deciding an ineffective assistance of counsel claim, a court need not address both prongs of the conjunctive Strickland standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test.

unfair or the verdict generally suspect. <u>Strickland v.
Washington</u>, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80
L.Ed.2d 674 (1984).

> <u>State ex rel. Sanborn v. State</u>,
> No. 2009-WR-0568 (La. App. 5th
> Cir. July 10, 2009)(unpublished
> opinion). (Rec. doc. 34, p. 53).

In support of his claim that counsel was ineffective in not
seeking a mistrial based upon Kenner's testimony, Sanborn further
argues that the testimony was inadmissible under state law.[32]/
However, a federal court does "not sit as [a] 'super' state supreme
court in a habeas corpus proceeding to review errors under state
law." <u>Wilkerson v. Whitley</u>, 16 F.3d 64, 67 (5th Cir. 1994), <u>cert</u>.
<u>denied</u>, 513 U.S. 1085 (1995)(quotation omitted); <u>see also</u> <u>Swarthout</u>
<u>v. Cooke</u>, ___ U.S. ___, ___, 131 S.Ct. 859, 861 (2011)(federal
habeas review does not lie for errors of state law); <u>accord</u> <u>Molo v.</u>
<u>Johnson</u>, 207 F.3d 773, 776 n.9 (5th Cir. 2000); <u>Narvaiz v. Johnson</u>,
134 F.3d 688, 695 (5th Cir. 1998)(citing <u>Estelle v. McGuire</u>, 502
U.S. 62, 67-68 (1991); <u>Lewis v. Jeffers</u>, 497 U.S. 764, 780 (1990);
<u>West v. Johnson</u>, 92 F.3d 1385, 1404 (5th Cir. 1996), <u>cert</u>. <u>denied</u>,
520 U.S. 1242 (1997)); <u>see also</u> <u>Hogue v. Johnson</u>, 131 F.3d 466, 506
(5th Cir. 1997)(a disagreement as to state law is not cognizable on
federal habeas review). Habeas corpus review is limited to
questions of constitutional dimension, and federal courts generally
do not review the admissibility of evidence under state law.

---

[32]/ Rec. doc. 34, pp. 15, 18, 21-22, 28-29.

<u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991); <u>Gonzales v. Thaler</u>, 643 F.3d 425, 429 (5th Cir. 2011); <u>Jernigan v. Collins</u>, 980 F.2d 292, 298 (5th Cir. 1992), <u>cert</u>. <u>denied</u>, 508 U.S. 978 (1993).  The fact that counsel may have erred in not objecting to the testimony as violative of state law does not render his performance ineffective under <u>Strickland.</u>

Sanborn also argues that counsel was ineffective in failing to properly question <u>voir</u> <u>dire</u> members as to whether they or any of their friends or relatives had ever been the victim of a crime. Though not specified, the implication is that if any of the jurors had been the victim of a crime, the risk was greater that Kenner's testimony would have adversely affected their view of him.

The suggested correlation, i.e., if you or a friend or a relative had been a crime victim, you would be more inclined to be troubled over a domestic violence allegation, is tenuous at best. Moreover, a review of the <u>voir</u> <u>dire</u> proceedings reflects that all prospective jurors were questioned regarding their involvement with past crimes.  The first panel was asked: "Have you or a close friend ever been a victim of a crime."[33]/  The second panel was asked: "Does anybody have a close friend or a relative that's been the victim of a crime."[34]/  The fact that the exact same language was not used with regard to both panels, i.e., the first panel was

---

[33]/ St. ct. rec., vol. 4 of 7, p. 61

[34]/ St. ct. rec., vol. 4 of 7, p. 170.

not asked about relatives and the second panel was not specifically asked about themselves, is a distinction without substance. Regardless of the wording, the jurors clearly understood the question and responded appropriately.[35]/

Next, Sanborn argues that counsel's attempt to discredit Kenner was not necessary because Marion Sanborn offered virtually the same testimony as Kenner. Stated differently, because Kenner's testimony was cumulative of Marion Sanborn's testimony, there was no need for counsel to discredit Kenner, thereby eliciting Kenner's testimony that Sanborn had hit her.

As evidenced by the trial transcript,[36]/ Kenner testified before Marion Sanborn did. Additionally, it was counsel's duty to attempt to discredit all of the State's witnesses. Had counsel not attempted to do so, Sanborn would have undoubtedly urged that as further support of his claim of ineffective assistance of counsel.

Next, Sanborn finds fault with counsel because she did not specifically argue that the alleged beatings were a reason not to believe the witness, Danielle Kenner. A review of counsel's cross-examination reflects that counsel provided jurors with an ample basis for disbelieving Kenner's testimony:

> Q. Your June 18th 1999 statement, you're admitting that
> that was a lie, right?
> A. Yes.

---

[35]/ St. ct. rec., vol. 4 of 7, pp. 61-65; pp. 170-175.

[36]/ St. ct. rec., vol. 6 of 7, pp. 39, 81.

Q. And during that statement the Detective asked you,
is everything you're telling him the truth to the best
of your knowledge, and you said, "yes," right?
A. Yes.
Q. So you're a liar, aren't you.
A. You could call me that, yes.
Q. Now, during the statement of June 18th 1999 when you
were recounting for the Detective what had happened
during the robbery, you told the Detective that John
Carroll, who was also a victim, said that he heard ...
one of the robbers refer ... to the other by the name
of "Nino." Do you remember saying that?
A. Yes.
Q. If the victim, John Carroll, said that no one
referred to anyone by any name during the robbery,
who's lying, you or him?
A. I'm lying. But I told him that I made the name up.
Q. Oh, you made up the whole Nino thing?
A. Yes, I did
Q. There is no Nino, is there?
A. No such thing.[37]/

Based upon counsel's cross-examination, it was evident that

Kenner was a less than trustworthy witness. To argue this point

would not have been appropriate during cross-examination. Counsel,

however, did argue to jurors that Kenner was not trustworthy during

her closing statement:

> [n]ow let's talk about Danielle Kenner. I don't
> think that we could even disagree that Danielle Kenner
> is a liar. Danielle Kenner admitted, "I'm a liar." In
> fact, she said in her testimony before a court hearing
> that, "I'm not one to keep lying," but she came in here
> today, and she kept lying. Do you remember her
> testimony? She even admitted, "I guess that's one of
> those lies again." I mean ladies and gentlemen, if
> you're going to rip a man away from his life, don't do
> it based on the testimony of a woman who tells you,
> "I'm a liar," when there's absolutely no other evidence

---

[37]/ St. ct. rec., vol. 6 of 7, pp. 54-55.

that's supporting what she's saying, and she didn't see anything.[38]/

Sanborn next complains that "counsel rejected a jury instruction which would limit the evidence to the purpose for which it was offered."[39]/  Though unclear, it appears that Sanborn is complaining that counsel rejected a jury charge which would have limited the jury's consideration of Kenner's domestic violence testimony to the purpose for which it was intended, to show Kenner's bias against Sanborn.

At the charge conference, the trial judge made reference to Kenner's testimony, explaining that he was going to instruct the jury regarding witness bias.  However, because the alleged beatings could be considered a crime, e.g., simple battery, he asked whether counsel also wanted him to instruct the jury regarding "other crimes evidence."[40]/

Counsel declined the extra charge for obvious reasons.  First, the trial judge was already going to instruct the jurors as to bias.  Second, the "other crimes evidence" charge may well have made Sanborn's actions against Kenner seem more serious.[41]/

---

[38]/ St. ct. rec., vol. 7 of 7, p. 445.

[39]/ Rec. doc. 34, p. 17 (footnote omitted).

[40]/ Rec. doc. No. 30-1, p. 80.

[41]/ Interestingly, Sanborn relies on Nero v. Blackburn, 597 F.2d 991, 994 (5th Cir. 1979), a case where counsel was deemed ineffective for failing to seek a mistrial when evidence of the defendant's past crimes was introduced.  In this case, defense

Counsel's strategy in this regard is evident; she was not deficient in declining such a charge and Sanborn was not prejudiced by her action.

Next, Sanborn argues that counsel's elicitation of the domestic violence testimony may have led the jury to consider him a violent, bad person, the same type of person who would be capable of the violence inflicted in connection with the armed robbery. However, as stated above, the weight to be given evidence is squarely within the province of the jury. The jury could also have interpreted the testimony as showing Kenner's clear bias against Sanborn and the basis for her assertion that Sanborn confessed to the crime. It is not within a habeas court's authority to speculate as to what evidence swayed the jury in rendering its verdict. Charriez v. Greiner, 265 F.R.D. 70, 90 (E.D.N.Y. 2010)(it is inappropriate on habeas review to speculate as to possible reasons for the jury's verdict).

B. DEFECTIVE AMENDED INDICTMENT

Sanborn also argues that counsel was ineffective in failing "to file a motion in arrest of judgment due to the substantially defective indictment."[42]/   Sanborn complains that the amended indictment was defective because it merely charged him with armed

---

counsel attempted to convey to the jurors that no crime had been committed in getting Kenner to admit that even no police report had been filed against Sanborn.

[42]/ Rec. doc. 43, p. 7.

robbery without setting forth the elements of armed robbery.  As a result, Sanborn claims he was not informed of "the crime against which he had to defend."[43]/

To the extent Sanborn argues that the indictment failed to comply with the requirements of Louisiana law, as stated above, a federal court does "not sit as [a] 'super' state supreme court in a habeas corpus proceeding to review errors under state law." Wilkerson, 16 F.3d at 67 (quotation omitted).  This court's analysis focuses instead on due process considerations which requires a showing that the errors of the state court made the underlying proceeding fundamentally unfair.  Neyland v. Blackburn, 785 F.2d 1283, 1293 (5th Cir.), cert. denied, 479 U.S. 930 (1986). Thus, the Court may consider Sanborn's arguments only in the context of federal constitutional law.

The United States Court of Appeals for the Fifth Circuit has declined to review claims of insufficient indictment forms because "the sufficiency of a state indictment is not a matter for federal habeas corpus relief unless it can be shown that the indictment is so defective that the convicting court had no jurisdiction ... [and] this can be determined only by looking to the law of the state where the indictment was issued." Alexander v. McCotter, 775 F.2d 595, 598 (5th Cir. 1985)(citation and quotations omitted); Evans v. Cain, 577 F.3d 620, 624–25 (5th Cir. 2009); Davis v. Craig,

---

[43]/ Rec. doc. 43, p. 11.

66 F.3d 319, 1995 WL 534730, at *3 (5th Cir. 1995)(table)(same).
Resolution of such an issue on federal habeas review is precluded
when the validity of an indictment was presented to the state's
highest court and was found to be sufficient. <u>Alexander</u>, 775 F.2d
at 598.

Sanborn's claim challenging the sufficiency of the amended
indictment was considered and rejected by the Louisiana Fifth
Circuit in his direct criminal appeal. <u>Sanborn</u>, 831 So.2d at 326-
28. The Fifth Circuit found that Sanborn was not prejudiced by
either the form of the indictment or the fact that it was amended
just prior to trial. <u>Id</u>. at 328.[44]/ Thereafter, by denying
Sanborn's writ application, <u>State v. Sanborn</u>, 854 So.2d 346 (La.
2003), the Louisiana Supreme Court necessarily acquiesced in the
state appellate court's finding that Sanborn was not entitled to
relief on the claim. <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 802
(1991); <u>Alexander</u>, 775 F.2d at 599 ("[b]y refusing to grant
appellant relief ... the Texas Court of Criminal Appeals has
necessarily, though not expressly, held that the Texas courts have
jurisdiction and that the indictment is sufficient for that
purpose.") The Louisiana Supreme Court has therefore had the
opportunity to address Sanborn's challenge to his indictment and

_____

[44]/ While the court's opinion focused on the timing of the
amendment, the court likewise endorsed the sufficiency of the
indictment. The court noted that in the earlier, original
amendment to the indictment the armed robbery statute (R.S. 14:64),
with which Sanborn was charged, was clearly designated. <u>Id</u>.

has by inference determined that the indictment was sufficient. For this reason, federal habeas review of this claim is foreclosed.

Even applying a due process analysis, in the context of whether counsel was ineffective in failing "to file a motion in arrest of judgment" because of a defective indictment, Sanborn cannot satisfy either prong of the Strickland test unless he shows that the indictment was so defective that it deprived the convicting court of jurisdiction. McKay v. Collins, 12 F.3d 66, 68 (5th Cir. 1994). He has not done so.

Louisiana law expressly provides for the use of a "short form" indictment for charges of armed robbery and requires only that the statement of the charge include the following minimal allegations: "AB, while armed with a dangerous weapon, robbed CD." LSA-C.Cr.P. Art. 465(A)(42). The indictment[45]/ in the instant case complied with state law, merely substituting "with force of arms" for "armed with a dangerous weapon".

Because the amended indictment was not defective, there was no basis for counsel to file a motion in arrest of judgment. Counsel did not act deficiently or prejudicially in failing to present a meritless motion. See Smith v. Puckett, 907 F.2d 581, 585 n.6 (5th Cir. 1990), cert. denied, 498 U.S. 1033 (1991)("[c]ounsel is not deficient for, and prejudice does not issue from, failure to raise a legally meritless claim.").

---

[45]/ St. ct. rec., vol. 6 of 7, p. 2.

28

## RECOMMENDATION

For the foregoing reasons, it is hereby recommended that the application for federal habeas corpus relief filed by petitioner, Christopher Earl Sanborn, be **DISMISSED WITH PREJUDICE.**

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. §636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996)(en banc).[46]/

New Orleans, Louisiana, this 23rd day of ____May____, 2013.


_____
ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

---

[46]/ Douglass referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.